**John Vincent McELROY,
Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A04–9109–CR–282.**

Court of Appeals of Indiana,
Fourth District.

May 27, 1992.

Transfer Denied July 16, 1992.

John F. Crawford, Indianapolis, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

CONOVER, Judge.

Defendant–Appellant John Vincent McElroy appeals his convictions and sentences for Rape, a class A felony (IND.CODE 35–42–4–1(a)), two counts of Battery, a class C felony (IC 35–42–2–1), three counts of Robbery, a class B felony (IC 35–42–5–1), and three counts of Confinement, a class B felony (IC 35–42–3–3).

We affirm.

McElroy raises the following restated issues for our review:

1. whether the State established a sufficient evidentiary foundation for the admission of genetic typing (DNA) evidence;

2. whether the trial court erred in admitting laboratory notes, reports, and exhibits into evidence;

3. whether the State established a sufficient chain of custody to support the admission of blood and clothing evidence used for DNA comparison;

4. whether separate sentences for the Robbery and Confinement convictions violated double jeopardy;

5. whether consecutive sentences for the Robbery and Confinement offenses violated double jeopardy; and

6. whether the sentence of one hundred and eighty-six years imprisonment was manifestly unreasonable and constitutionally disproportionate to the nature of the offenses.

At about 9:00 p.m. on the evening of June 5, 1989, the last patient left the Indianapolis dental office of Dr. Charles Solomon. Inside the office were three female employees, C.R., the receptionist, J.C., a dental assistant, and L.G., a dentist. At about 9:30 p.m., the front door flew open and four men entered wearing masks. One held a gun. He pointed the gun at C.R. and told her to "shut up and get on the floor." (R. 369).

One of the men removed C.R.'s pants and underwear and placed his hand in her vagina. Two of the men began hitting and kicking J.C. and L.G. Later, one of the men raped J.C. Another attempted to rape L.G., but she fought him off.

After beating and molesting the women, the men threw all three victims into a room and told them not to leave. The men then fled with the victims' purses and money from the cash drawer.

McElroy was identified as one of the four men by an informant, Edward A. Hefley, and co-defendant Lawrence D. Seawood. Seawood testified that in the dentist's office McElroy stated "let's get the girls." (R. 690). McElroy and the other two men each grabbed a woman. Seawood remained in the lobby area as a lookout. Seawood did not see what McElroy did with

the woman he grabbed. However, on the next day while they read about the incident in the newspaper, McElroy told Seawood he engaged in intercourse with J.C. (R. 718).

McElroy was charged with Rape, Criminal Deviate Conduct, three counts of Robbery, three counts of Confinement, and two counts of Battery. He was not convicted on the Criminal Deviate Conduct count; however, he was convicted of all the other offenses. He was sentenced to fifty years for Rape, twenty years for each Robbery conviction, twenty years for each Confinement conviction, and eight years for each Battery conviction. All sentences were to run consecutively. The total sentence was for one hundred and eighty-six years imprisonment.[1]

Additional facts are given below as necessary.

As part of its case against McElroy, the State presented DNA identification evidence which showed the odds were twenty million to one that he committed the rape. McElroy contends the State failed to lay an evidentiary foundation to establish the reliability of the particular method of DNA identification used in the present case. He specifically contends the jury was deprived of the opportunity to resolve the issue of reliability because a biological science technician who participated in the procedure did not testify.

At trial, Harold Deadman, a Federal Bureau of Investigation agent, testified as an expert witness on DNA identification. He was the supervisor of a two person DNA analysis team at the FBI lab which analyzed semen found on J.C.'s clothing. Alice Hill, a biological science technician, was the other member of the analysis team, and worked under Agent Deadman's direct supervision according to a standardized protocol which permitted no deviation. Hill consulted with Agent Deadman on anything out of the ordinary. Hill kept the same type of detailed, standard notes on the procedures in the present case as she had

---

1. Jurisdiction lies with this court because no sentence for a single offense was greater than fifty years. *See,* Ind.Appellate Rule 4.

produced in at least two hundred and fifty other cases. Agent Deadman testified to his interpretation of data gained through the team's analysis. He also testified regarding proper procedure, Hill's activities under his supervision, and the use of her lab notes in reaching his conclusions.

In examining this issue it is important to note McElroy is not questioning the reliability of DNA identification in general. In fact, he states in his brief that the issue specifically relates to the reliability of the method used in the present case. Agent Deadman clearly established what the standard procedures for DNA identification were. He also established he and his assistant followed standard procedure in the instant case, without any deviation. Furthermore, contrary to McElroy's contention that Agent Deadman improperly relied on information from an "outside source," it is clear he relied only on information gleaned under his direct supervision. This type of information was routinely relied upon in arriving at a conclusion on the identification of the source of a sample. This evidence was admissible as the basis for Agent Deadman's conclusions. *See, Miller v. State* (1991), Ind., 575 N.E.2d 272, 274 (holding that even inadmissible hearsay is admissible if of the type generally relied upon by experts in the field).

■ McElroy also contends the trial court erred in allowing a DNA membrane, autoradiographs (autorads), and laboratory notes into evidence.[2] He contends the evidence was inadmissible hearsay which could not qualify for admission as business records.

Even assuming the evidence could not qualify for admission under the business records exception, the testimony reflecting their factual content was admissible as the basis for Agent Deadman's conclusions. The evidence was of the type customarily relied on by experts such as Agent Deadman. Consequently, any error in the admission of the evidence was harmless because the essentials of the challenged evidence were properly admitted through Agent Deadman's testimony. *See, Wilber v. State* (1984), Ind., 460 N.E.2d 142, 143; *Clouse v. Fielder* (1982), Ind.App., 431 N.E.2d 148, 155.

■ McElroy further contends the chain of custody for blood and clothing evidence used for DNA identification was broken by the failure of the laboratory technician to testify. He limits his argument to the State's alleged failure to prove the chain of custody within the FBI laboratory.

In *Kennedy v. State* (1991), Ind., 578 N.E.2d 633, *cert. denied,* — U.S. —, 112 S.Ct. 1299, 117 L.Ed.2d 521 (1992), our supreme court was faced with the exact same issue. The court held:

The evidence in question was gathered from the scene and mailed to the FBI laboratory for analysis. An FBI lab technician who prepared the evidence on slides for examination by [supervisors] Deedrick and Corby was not called as a witness to testify about the chain of custody. Instead, Deedrick testified that, although he did not stand next to the technician while the evidence was prepared, the technician worked under Deedrick's control and supervision, and that the use of technicians in this way had been standard procedure at the FBI for forty years. Kennedy challenges the chain of custody only within the FBI laboratory; he does not dispute that the State presented sufficient chain of custody evidence to establish transfer of the evidence from the place it was gathered to the FBI laboratory.

In Indiana, the party offering the evidence need only provide "reasonable assurance" that the evidence passed through various hands in an undisturbed condition, and need only provide evidence that "strongly suggests" the exact whereabouts of the evidence at all times. Defendant must then present evidence which must do more "than raise the mere

---

**2.** A DNA membrane is a nylon material containing DNA strands separated by size. An autorad is the final product of the testing process. It involves the placement of pieces of x-ray film on either side of a nylon membrane also produced in the process. The autorad pieces of x-ray film are removed from the nylon membrane and developed. (R. 1291).

possibility that the evidence could have been tampered with or that a substitution or alteration could have been made." Thus, the State need not establish a perfect chain of custody, and any gaps go to the weight of the evidence and not its admissibility. In addition, there is a presumption of regularity in the handling of exhibits by public officers, and a presumption that public officers discharge their duties with due care. Here, we conclude that the State sufficiently established that customary procedures were followed by the FBI. We are satisfied that there is the required reasonable assurance that the property moved through the hands of the FBI agents in an undisturbed condition, and that the evidence strongly suggests the exact whereabouts of the evidence during the time it was in the possession of the FBI. Accordingly, we find no error in the admission of the evidence. (Citations omitted).

578 N.E.2d at 638–639.

In the present case, Agent Deadman testified that the evidence was handled according to standard procedure within the FBI laboratory. The incoming samples were assigned to the two person team of Agent Deadman and Hill; no other team handled the samples. The blood samples were kept in the team's padlocked freezer except when being tested by the team. Under *Kennedy*, Agent Deadman's testimony was sufficient to establish chain of custody in the face of a challenge raising only the mere possibility of tampering, substitution, or alteration.

■ McElroy next contends sentences for both Confinement and Robbery violate double jeopardy. He cites *Wethington v. State* (1990), Ind., 560 N.E.2d 496, in support of his contention.

In *Wethington*, the defendant was charged with both Robbery and Confinement. The charging information alleged the exact same force as an element of both offenses. After acknowledging the statutory differences in the two offenses, the court nevertheless held that sentences for

both offenses violated double jeopardy. The court stated:

Today's decision does not affect the body of case law from this Court which makes it clear that, given a single criminal transaction, a defendant may appropriately be charged with, convicted of, and sentenced for both confinement and a distinct crime which entails some sort of confinement as necessary to effectuate that crime, such as robbery or rape. The holding of this case is limited to instances such as this one where criminal confinement is charged along with another crime, the commission of which inherently involves a restraint on the victim's liberty, and where the language of the charging instruments makes no distinction between the factual basis for the confinement charge and the facts necessary to the proof of an element of the other crime.

560 N.E.2d at 508. (Citations omitted).

In the present case, the Confinements were charged because McElroy "did knowingly, while armed with a deadly weapon, to-wit: A SHOTGUN, confine [J.C., C.R., and L.G.], without [their] consent by FORCING [THEM] TO LIE ON THE FLOOR OF A BUSINESS LOCATED AT 3945 NORTH EAGLE CREEK PARKWAY." (R. 25). The Robberies were charged because McElroy "did knowingly, while armed with a deadly weapon, to-wit: A SHOTGUN, take from the person or presence of [J.C., C.R., and L.G.] property, to-wit: [PURSES] AND [THEIR] CONTENTS, by putting [them] in fear or by using or threatening the use of force on [them]." (R. 24).

McElroy argues the charging instruments make no distinction between the factual basis for the Confinement charges and the Robbery charges. The evidence indicates McElroy and his cohorts entered the building with masks on and a shotgun in their possession. At that point, they clearly placed the victims in fear. Soon thereafter, they forced the victims to the floor. They then began abusing the victims and finally ran out the door with the victims' purses and money from the cash drawer.

The charging instruments break down the separate acts of the confinements and the robberies with specificity. The robberies were effectuated by putting the victims in fear. The confinements were not co-extensive with the robberies. Accordingly, the separate convictions did not place McElroy in double jeopardy. *See, Wethington,* at 508 (*citing Jones v. State* (1988), Ind., 518 N.E.2d 479; *Purter v. State* (1987), Ind., 515 N.E.2d 858; *Gillie v. State* (1987), Ind., 512 N.E.2d 145; *Brim v. State* (1984), Ind., 471 N.E.2d 676). *See also, Lyles v. State* (1991), Ind.App., 576 N.E.2d 1344, 1352–1353, *reh. denied, trans. denied.*

■ McElroy also contends the trial court erred in ordering consecutive sentences for the robberies and the confinements because all the offenses "were part of a continuous sequence of acts at one location pursuant to one common plan." Brief of Appellant at 25. He further contends the imposition of consecutive sentences violates double jeopardy. In support of his contention, McElroy cites *Clem v. State* (1873), 42 Ind. 420, and cases following its rationale.

■ McElroy misses the focus of *Clem* and its progeny. In *Clem,* our supreme court held the single act of shooting a gun which resulted in the death of two persons permitted only one murder conviction. Cases following *Clem* focus upon the statutory definition of an offense as well as the intent of the actor to determine whether the actor is guilty of more than one offense. Here, McElroy and his cohorts intended to, and did, specifically confine each of the three victims. They also intended to, and did, take personal property from each victim. Separate intentional acts are separately punishable.

■ Finally, McElroy contends his sentence of one hundred and eighty-six years was manifestly unreasonable. Thus, he maintains the sentence violates the Eighth Amendment to the United States Constitution and Article 1, § 16 of the Indiana Constitution.

In *Clark v. State* (1990), Ind., 561 N.E.2d 759, the appellant challenged his thirty-five year sentence (as enhanced under the Habitual Offender statute) for Operating While Intoxicated and Driving While Suspended as excessive and disproportionate. Our supreme court held an extensive proportionality analysis is required only when a life sentence without parole is being challenged. Thus, it held the Eighth Amendment of the United States Constitution was not violated where a sentence of such magnitude was not involved. *Id.* at 765 (*citing Solem v. Helm* (1983), 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637). The same is true here.

The *Clark* court did go on to examine the appropriateness of the sentence under Article 1, § 16 of the Indiana Constitution, which provides "all penalties shall be proportioned to the nature of the offense." The court noted "[t]he nature and extent of penal sanctions are primarily legislative considerations and courts are not at liberty to set aside a legislatively sanctioned penalty because it may seem too severe to the Court." *Id.* However, the court further noted its constitutional duty to review the duration of a sentence because "it is possible for the statute under which appellant is convicted to be constitutional, and yet be unconstitutional as applied to appellant in this particular instance." *Id.*

[8] This court has a constitutional duty to revise a sentence only if the sentence appears to be manifestly unreasonable in light of the nature of the offense and the character of the offender. *Fointno v. State* (1986), Ind., 487 N.E.2d 140, 144. "A sentence is manifestly unreasonable when no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed." *Saunders v. State* (1992), Ind., 584 N.E.2d 1087, 1088. As we held in *Cunningham v. State* (1984), Ind.App., 469 N.E.2d 1, *reh. denied, trans. denied:*

> We are in as good a position as the trial court to make these determinations based upon the record before us in a proper case. All the material available to the trial court at the time of sentencing is equally available to us on appeal. It is contained in the record. Further,

the appellate process is uniquely suited to dispassionate consideration of the subject free of the everyday pressures of a trial courtroom.

469 N.E.2d at 8.

A trial judge is authorized to determine whether the terms of imprisonment shall be served concurrently or consecutively. IC 35–50–1–2. In the present case, the trial court imposed consecutive sentences after noting as aggravating circumstances McElroy's lengthy record, the risk of further criminal acts because of his utter disregard for society and its rules, and failed rehabilitation attempts via parole and suspended sentences. The nature of McElroy's offense shows a series of criminal acts perpetrated on three women after lying in wait. McElroy's past behavior shows he is a risk to repeat his offenses. Under these circumstances, we do not find the sentences to be manifestly unreasonable.

Affirmed.

CHEZEM and BAKER, JJ., concur.