Norman **TIMBERLAKE**, Appellant–Defendant,

v.

**STATE of Indiana**, Appellee–Plaintiff.

No. 49A02–9603–CR–179.

Court of Appeals of Indiana.

May 15, 1997.

Lesa Lux Johnson, Indianapolis, for Appellant–Defendant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Norman Timberlake appeals his conviction by jury of robbery[1] as a class B felony; three counts of criminal confinement[2] as a class B felony; and carrying a handgun without a license[3] as a class A misdemeanor; his adjudication as an habitual offender;[4] and his sentence thereon.

We affirm in part, reverse in part, and remand for resentencing.

### ISSUES

1. Whether the trial court erred in denying Timberlake's motion to dismiss the habitual offender charge.

2. Whether the trial court erred in admitting a Village Pantry surveillance videotape.

3. Whether Timberlake's separate sentences for robbery and confinement violate double jeopardy.

4. Whether the trial court's imposition of consecutive sentences for robbery, criminal confinement and carrying a handgun without a license violates Ind.Code 35–50–1–2.

---

1. Ind.Code 35–42–5–1.

2. Ind.Code 35–42–3–3.

3. Ind.Code 35–47–2–1.

4. Ind.Code 35–50–2–8.

## FACTS

On February 4, 1993, at approximately 7:30 p.m., Norman Timberlake entered the Village Pantry at 30th Street and Post Road in Marion County. Village Pantry employee Paul Taylor was working behind the counter, and manager Deborah Henry was in the back of the store stocking beverages in the cooler. Timberlake walked to the coffee maker, and Taylor walked over and poured Timberlake a cup of coffee. Timberlake asked to speak with the manager, and Taylor told Henry that a customer wanted to speak with her. Taylor walked back behind the counter, and Henry came out of the cooler.

After all of the customers had left the store, Timberlake pulled out a .25 caliber chrome-plated automatic handgun and said, "You know what this is." (R. 498). Timberlake told Taylor to come out from behind the counter, and he made Taylor and Henry sit on the floor. As he held the gun to Henry's temple, Timberlake told Taylor to get up and open the cash register. Timberlake also told Taylor that he would kill Henry if Taylor did anything wrong. Taylor, who was standing in front of the counter, had difficulty opening the register, and Henry "begg[ed]" Timberlake to let her open it. (R. 561).

As Timberlake, Henry and Taylor were walking behind the counter, customer Gary Levi entered the store. Timberlake looked at Levi, showed Levi his handgun, and said, "Well, you're in it with us now." (R. 564). Timberlake told Levi to come behind the counter. Henry opened the register, and Taylor took the money out of the register, put it into a bag, and gave it to Timberlake. Timberlake then told Henry to open the safe. When Henry explained that the safe had a time-delay system, Timberlake became angry. Taylor told Timberlake that there was money in another cash register. Taylor opened the second register, and Timberlake removed the money from it. Thereafter, Timberlake told Henry, Taylor and Levi to go to the back room. The three individuals "froze," (R. 509), and Timberlake instructed them to get on their knees on the floor and not move. Timberlake walked out of the store as another customer entered it. Taylor locked the front door, and as he was about to call the police, he learned that Henry had pushed the silent alarm button while she was behind the counter. A Village Pantry surveillance camera videotaped the robbery.

Taylor, Henry and Levi were subsequently shown a photographic array, and all three individuals identified Timberlake. When Timberlake was arrested, the police officers found a .25 caliber chrome-plated automatic handgun in his pocket.

Timberlake was convicted by jury of robbery as a class B felony, three counts of criminal confinement as a class B felony, and carrying a handgun without a license as a class A misdemeanor. He was also adjudicated to be an habitual offender. The trial court sentenced Timberlake to 20 years for the robbery, 20 years for each criminal confinement, and one year for carrying a handgun without a license. Further, the trial court enhanced Timberlake's robbery sentence by 30 years because of his habitual offender adjudication. Lastly, the trial court ordered Timberlake to serve the sentences consecutively, for a total of 111 years. We will provide additional facts in our discussion of the issues.

## DECISION

### I. Motion to Dismiss the Habitual Offender Charge

Ind.Code 35–50–2–8(a) provides that the "state may seek to have a person sentenced as an habitual offender for any felony by alleging, on a page separate from the rest of the charging instrument, that the person has accumulated two (2) prior unrelated felonies...." Before July 1993, the state was permitted to file an habitual offender charge "at any time before, during, or after trial so long as it [did] not prejudice the substantial rights of the defendant." *Gilmore v. State,* 275 Ind. 134, 415 N.E.2d 70, 73 (1981). However, effective July 1, 1993, the legislature added the following provision to Ind.Code 35–34–1–5:

> (e) An amendment of an indictment or information to include a habitual offender charge under IC 35–50–2–8 must be made not later than ten (10) days after the omnibus date. However, upon a showing of

good cause, the court may permit the filing of a habitual offender charge at any time before the commencement of trial.

Here, on February 10, 1993, the state charged Timberlake with robbery, three counts of criminal confinement, and carrying a handgun without a license. The trial court held an initial hearing on February 12, 1993, and set the omnibus date for April 21, 1993. After numerous continuances, on March 1, 1995, the trial court scheduled trial for October 2, 1995. On September 12, 1995, the State filed an habitual offender charge against Timberlake. On September 27, 1995, Timberlake filed a motion to dismiss the charge. Specifically, Timberlake argued that the charge was not timely filed according to the requirements set forth in Ind.Code 35–34–1–5(e). The trial court denied Timberlake's motion.

Timberlake contends that the trial court erred in denying his motion to dismiss the habitual offender charge. We disagree.

■ As the State points out, and the prosecutor noted at the motion to dismiss hearing, the "amended statute would have required the State to file the habitual offender count before the effective date of the statute." State's Brief, p. 4. Specifically, the omnibus date was April 21, 1993. According to the amended statute, the habitual offender charge would have had to have been filed not later than May 1, 1993—two months before the amended statute became effective. Therefore, the State could not have complied with the amended statute. Timberlake responds that because the "State was aware of the amendment limiting the filing of the habitual offender when it was enacted by the legislature in the early months of 1993," the State should have filed the habitual offender charge within ten days of the statute's effective date. We agree with the State that the amended statute imposes no such requirement.

■ Timberlake further contends that the "amendment of [I.C.] 35–34–1–5(e) was an ameliorative sentencing amendment in that it limited the previously unlimited right of the prosecution to file the habitual offender count." Timberlake's Brief, p. 13. Therefore, according to Timberlake, the "doctrine of 'amelioration' applies." Timberlake's Brief, p. 12. Under the doctrine of amelioration, a defendant who is sentenced after the effective date of a statute providing for more lenient sentencing is entitled to be sentenced pursuant to the new statute rather than the sentencing statute in effect at the time of the commission of the crime. *Lunsford v. State,* 640 N.E.2d 59, 60 (Ind.Ct.App.1994). Timberlake's reliance on the doctrine of amelioration is misplaced. Specifically, the doctrine of amelioration applies to sentencing, and Timberlake's argument concerns the trial court's denial of his motion to dismiss an habitual offender charge. I.C. 35–34–1–5(e) is not an ameliorative sentencing amendment. Rather, it concerns the amendment of informations and indictments. The doctrine of amelioration does not apply in this case.

Lastly, Timberlake posits that "even should this Court not find that it is specifically a sentence amelioration, the limitation would still be applicable in this case because it is procedural and not substantive." Timberlake's Brief, p. 13. In support of his proposition, Timberlake refers us to *Willis v. State,* 567 N.E.2d 1170 (Ind.Ct.App.1991), *trans. denied.* However, the facts of *Willis* are distinguishable from those before us. First, *Willis* involves the trial court's denial of a petition for sentence modification, not a motion to dismiss an habitual offender charge. Further, as the State points out, "*Willis* ... did not require any party to comply with a new statute even before the effective date of the statute." State's Brief, p. 5. The trial court did not err in denying Timberlake's motion to dismiss the habitual offender charge.

## II. *Videotape*

■ The standard applicable to the admissibility of photographs applies to videotapes. *Meisberger v. State,* 640 N.E.2d 716, 724 (Ind.Ct.App.1994), *trans. denied.* The admission of photographic evidence is within the discretion of the trial court, and we will reverse upon a showing that the trial court abused its discretion. *Scott v. State,* 632 N.E.2d 761, 764 (Ind.Ct.App.1994).

Timberlake contends that the trial court erred in admitting the Village Pantry surveillance videotape of the robbery. Specifically, he contends that the State failed to lay a sufficient foundation for the videotape's admissibility. In support of his contention, Timberlake directs us to *Bergner v. State*, 397 N.E.2d 1012 (Ind.Ct.App.1979), wherein this court held that photographic evidence is admissible as substantive evidence under the "silent witness theory" so long as certain foundation requirements are met. Timberlake claims that these requirements were not met in this case. The State contends that *Bergner* is not applicable because the videotape was not offered as substantive evidence. Rather, according to the State, the videotape was offered as demonstrative evidence "to illustrate or make more comprehensible [the] sponsoring witness' testimony." State's Brief, p. 8. We agree with the State.

▇▇▇ As a general rule, photographs are admissible as demonstrative evidence if they illustrate a matter about which a witness has been permitted to testify. *Wormbly v. State*, 550 N.E.2d 95, 97 (Ind.Ct.App.1990), *trans. denied*. The proponent of the evidence must first authenticate the photograph. *Games v. State*, 535 N.E.2d 530, 540 (Ind.1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158 (1989), *reh'g denied*. Specifically, the sponsoring witness must establish that the photograph is a true and accurate representation of the things that it is intended to portray. *Id.* Further, the photograph must be relevant. *Id.* A photograph is relevant if it depicts a scene that a witness would be permitted to describe verbally. *Id.* at 540–41.

▇▇▇ Here, Taylor testified that he was working at the Village Pantry on February 4, 1993, when an individual entered the store, asked to speak with the manager, pulled out a .25 caliber handgun, forced Taylor and the manager to get on the floor, forced them to walk behind the counter, forced a customer to walk behind the counter, took money out of two of the cash registers, and left the store. Taylor further testified that Timberlake was the individual who had robbed the store. The State then offered into evidence the Village Pantry surveillance tape of the robbery. Taylor authenticated the tape by testifying that it was a "true and accurate depiction of what [he] observed that evening, on February 4, 1993, as [he had] just described it." (R. 510). Further, the tape is relevant because it depicts the scene which Taylor had described verbally. The trial court did not abuse its discretion in admitting the videotape.

### III. *Double Jeopardy*

Timberlake further contends that his separate sentences for robbery and confinement violate double jeopardy. In support of his contention he refers us to *Wethington v. State*, 560 N.E.2d 496 (Ind.1990), wherein Wethington was charged with both robbery and confinement. Specifically, the charging instruments read as follows:

[William L. Wethington did] knowingly or intentionally take property from another person or from the presence of another person, to wit: $120.00 ... in cash and a small quantity of marijuana from the home of Pat Adair by using or threatening the use of force on any persons, to wit: Pat Adair, Dianne Adair and Danny Adair, in that [he] bound and gagged the above-named individuals, forced them to [lie] on the floor, covered them with a blanket, and poured gasoline over the area where the victims [lay]. All of the above acts were done while [Wethington] was armed with a deadly weapon, thereby committing Robbery, a Class B felony....

[William L. Wethington did] knowingly or intentionally confine another person, to wit: Pat Adair, Dianne Adair and Danny Adair by binding them with rope, gagging them, forcing them to lie on the floor, covering them with a blanket and pouring gasoline around the area where they lay, which events occurred within the residence of Pat Adair without the consent of Pat Adair, Dianne Adair and Danny Adair, all while said William L. Wethington was armed with a deadly weapon, to wit: a gun, thereby committing Criminal Confinement, a Class B felony....

*Id.* at 507.

Wethington was subsequently convicted of both offenses and received a separate sen-

tence for each one. On appeal, he argued that the imposition of separate sentences violated double jeopardy. After acknowledging the statutory differences between the two offenses, our supreme court nevertheless held that sentences for both offenses violated double jeopardy because the "acts alleged by the State to substantiate a necessary element of the robbery charge, i.e., the force that was used to effectuate the taking, [were] precisely co-extensive with the acts alleged as constituting a violation of the criminal confinement statute...." *Id.* at 508.

Our supreme court further explained as follows:

> Today's decision does not affect the body of case law from this Court which makes it clear that, given a single criminal transaction, a defendant may properly be charged with, convicted of, and sentenced for both confinement and a distinct crime which entails some sort of confinement as necessary to effectuate that crime such as robbery or rape. The holding of this case is limited to instances such as this one where criminal confinement is charged along with another crime, the commission of which inherently involves a restraint on the victim's liberty, and where the language of the charging instruments makes no distinction between the factual basis for the confinement charge and the facts necessary to the proof of an element of the other crime.

*Id.* (Citations omitted).

However, the facts before us are distinguishable from those in *Wethington* because here, the charging informations do not allege the exact same force as an element of both offenses. Rather, the facts before us are analogous to those in *McElroy v. State,* 592 N.E.2d 726 (Ind.Ct.App.1992), *trans. denied,* wherein McElroy was charged with robbery and confinement. Specifically, the robberies were charged because McElroy "did knowingly, while armed with a deadly weapon, to-wit: A SHOTGUN take from the person or presence of [J.C., C.R. and L.G.] property, to wit: [PURSES] AND [THEIR] CONTENTS, by putting [them] in fear or by using or threatening the use of force on [them]." *Id.* (Emphasis in the original). The confinements were charged because

McElroy "did knowingly, while armed with a deadly weapon, to-wit: A SHOTGUN, confine [J.C., C.R., and L.G.], without [their] consent by FORCING [THEM] TO LIE ON THE FLOOR OF A BUSINESS LOCATED AT 3948 NORTH EAGLE CREEK PARKWAY." *Id.* at 730. (Emphasis in the original).

McElroy was subsequently convicted of both offenses and received separate sentences for each one. On appeal, McElroy argued that his separate sentences for confinement and robbery violated double jeopardy because the charging instruments made no distinction between the factual basis for the confinement charges and the robbery charges. We found that the evidence revealed that McElroy and his cohorts entered the business with masks on their faces and a shotgun in their possession. At that point, they clearly placed the victims in fear. Soon thereafter, they forced the victims to the floor. They then began abusing the victims and finally ran out the door with the victims' purses and money from the cash drawer. We found that the charging instruments broke down the separate acts of the confinements and the robberies with specificity. The robberies were effectuated by putting the victims in fear, and the confinements were not co-extensive with the robberies. Therefore, the separate convictions did not place McElroy in double jeopardy.

Here, the robbery was charged because Timberlake "did knowingly, while armed with a deadly weapon, that is: a handgun, take from the person or presence of Deborah Henry property, that is: United State currency, by putting Deborah Henry in fear or by using or threatening the use of force on Deborah Henry." (R. 43). The confinements were charged because Timberlake "did knowingly, while armed with a deadly weapon, that is: a handgun, confine [Henry, Taylor and Levi] without [their] consent ... by forcing [them] to get on the floor of the Village Pantry store located at 2945 North Post Road at gunpoint." (R. 43).

The evidence reveals that Timberlake entered the Village Pantry with a handgun in his possession. He showed it to Henry and Taylor, told them that they knew

what it was, and made them sit on the floor. At that point, Timberlake clearly placed Henry and Taylor in fear. Thereafter, Timberlake forced Henry and Taylor to open the cash register and give him the money. When Levi entered the store, Timberlake showed Levi his handgun and told him that he was now involved in it with them. After he had taken the money out of the cash registers, Timberlake told Henry, Taylor and Levi to go to the back room. When the three individuals froze, Timberlake instructed them to get on their knees on the floor and not move.

Here, as in *McElroy,* the charging instruments break down the separate acts of the robbery and confinements with specificity. The crime of robbery was effectuated by putting the victims in fear, and the crimes of confinement were not co-extensive with the robbery. Therefore, as in *McElroy,* Timberlake's separate sentences for robbery and confinement do not violate double jeopardy. *See also, Gillie v. State,* 512 N.E.2d 145 (Ind.1987), *habeas corpus denied,* 761 F.Supp. 601 (S.D.Ind.1989); *Brim v. State,* 471 N.E.2d 676 (Ind.1984).

## IV. *Sentencing*

The trial court sentenced Timberlake to 20 years for the robbery, 20 years for each criminal confinement, and one year for carrying a handgun without a license. Further, the trial court enhanced Timberlake's robbery conviction by 30 years because of his habitual offender adjudication. Lastly, the trial court ordered Timberlake to serve the sentences consecutively for a total of 111 years. Timberlake contends that the trial court erred in sentencing him. Specifically, Timberlake contends that the court's "imposition of consecutive sentences [for robbery, confinement and carrying a handgun without a license] violated I.C. 35–50–1–2."

In 1994, the legislature amended Ind.Code 35–50–1–2 to limit the trial court's previously unrestricted discretion when imposing consecutive sentences.[5] Specifically, I.C. 35–50–1–2 was amended to read as follows:

> The court may order terms of imprisonment to be served consecutively even if the sentences are not imposed at the same time. However, except for murder and felony convictions for which a person receives an enhanced penalty because the felony resulted in a serious bodily injury if the defendant knowingly or intentionally caused the serious bodily injury, the total of the consecutive terms of imprisonment, exclusive of terms of imprisonment under IC 35–50–2–8 [habitual offender statute] and IC 35–50–2–10 [habitual substance offender statute], to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the presumptive sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted.

In 1995, the legislature defined the language "episode of criminal conduct" as "offenses or a connected series of offenses that are closely related in time, place, and circumstance."[6] Ind.Code 35–50–1–2(b).

Timberlake argues that:

> It is clear that all of [his] convictions stem from the same episode of criminal conduct in that they constitute 'a connected series of offenses that are closely related in time, place, and circumstance.' I.C. 35–50–1–2(b). The State alleged a single robbery at a Village Pantry where three alleged victims were present and which lasted only a matter of minutes. After such time there were no other criminal acts alleged

---

**5.** We observe that Timberlake committed the crimes in February 1993. The legislature's amendment became effective July 1, 1994, and Timberlake was sentenced in December 1995. Although the amendment was not in effect at the time Timberlake committed the crimes, Timberlake is entitled to retroactive application of the amendment under the doctrine of amelioration. *See, Tedlock v. State,* 656 N.E.2d 273 (Ind.Ct.App.

1995). We further note that the legislature also amended the statute effective July 1, 1995, or to crimes committed after June 30, 1995.

**6.** In *Tedlock,* we held that the "legislature intended the term 'episode' as used in the 1994 amendment have the definition provided in the 1995 amendment...." *Tedlock,* 656 N.E.2d at 276.

against [Timberlake] or as relating to any of the alleged victims."

Timberlake's Brief, p. 18. We agree.

The State does not dispute that all of Timberlake's convictions arose out of an episode of criminal conduct. Rather, the State asks us to reconsider *Tedlock,* and find that Timberlake is not entitled to retroactive application of the amendment under the doctrine of amelioration. We decline the State's request, and remand this case to the trial court for resentencing in accordance with I.C. 35–50–1–2.

Affirmed in part, reversed in part, and remanded for resentencing.

RILEY and FRIEDLANDER, JJ., concur.