## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 27 2015, 9:59 am

Kevin S. Smith

**CLERK**
of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANT

Donald E.C. Leicht
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Myron D. Killebrew, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | February 27, 2015 <br><br> Court of Appeals Case No. 34A05-1407-CR-318 <br><br> Appeal from the Howard Superior Court <br><br> The Honorable William C. Menges, Jr., Judge <br><br> Cause No. 34D01-1308-FD-663 |

**Brown, Judge.**

Myron D. Killebrew appeals his convictions for strangulation as a class D felony, invasion of privacy as a class A misdemeanor, and domestic battery as a class A misdemeanor. Killebrew raises three issues which we revise and restate as:

    I.    Whether the trial court abused its discretion in admitting certain photographs into evidence; and

    II.   Whether the evidence is sufficient to sustain his conviction for invasion of privacy.[1]

We affirm.

## Facts and Procedural History

Killebrew and Ena Moore dated for approximately two or two and a half years, and during two periods of "a month or two at two different times" they lived

---

[1] Killebrew also attempts to challenge his sentence and suggests that the court either abused its discretion in sentencing him or that his sentence is inappropriate. As observed by the State in its brief, however, Killebrew does not formulate any argument with regard to either issue and instead merely recites the relevant standards of review. Indeed, the only statement regarding these issues in his brief that might be considered argument is the final statement of the argument section which states: "Killebrew argues that his convictions should be overturned; however, if this Court rules otherwise, [he] argues that all acts would have occurred in the space of seconds. All sentences imposed should be concurrent not consecutive." Appellant's Brief at 13. We find that Killebrew has waived his challenges to his sentence. *See, e.g.*, *Gentry v. State*, 835 N.E.2d 569, 575-576 (Ind. Ct. App. 2005) (holding that the defendant's "failure to offer more than a mere conclusory statement that his sentence should be reduced waives his opportunity for appellate review") (footnote omitted); *see also Cooper v. State*, 854 N.E.2d 831, 834 n.1 (Ind. 2006) (holding that the defendant's contention was waived because it was "supported neither by cogent argument nor citation to authority"); *Shane v. State*, 716 N.E.2d 391, 398 n.3 (Ind. 1999) (holding that the defendant waived argument on appeal by failing to develop a cogent argument); *Smith v. State*, 822 N.E.2d 193, 202–203 (Ind. Ct. App. 2005) ("Generally, a party waives any issue raised on appeal where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record."), *trans. denied*. Moreover, even were we to address the issue, we would not conclude that the court abused its discretion in sentencing Killebrew or that his sentence was inappropriate.

together "as if [they] were married . . . ." Transcript at 25. On August 2, 2012, after multiple violent altercations between Killebrew and Moore, Moore received an *ex parte* protective order against Killebrew stating in part that Killebrew "is prohibited from harassing, annoying, telephoning, contacting or directly or indirectly communicating with" Moore. State's Exhibit 1. The protective order was valid for two years through August 2, 2014, and was served on Killebrew the same day it was issued.

[3]     On August 24, 2013, Moore visited with some friends at a bar and played pool, and afterwards at around 9:00 p.m., she walked to Killebrew's home and he let her inside. They started drinking and at one point began to argue with each other in his bedroom. Killebrew shoved Moore onto the bed and grabbed her throat, and she was unable to breathe, was in pain, and thought she was going to die. While continuing to strangle her, Killebrew moved her in front of a mirror and stated "today was a good day to die." *Id.* at 34. Moore grabbed a drinking glass and hit Killebrew in the head with the glass, cutting his head. He then released her from his grasp, and, at that moment, someone knocked on the door to the home. Thinking the knock was the police, Killebrew had Moore, who was nude, cover up using a blanket and go to answer the door. Moore asked the person at the door to call the police, but that person refused, and she then ran out of the house to a neighbor's home to call the police.

[4]     Kokomo Police Department Officers Dustin Spicer and Cameron Cunningham were dispatched to Killebrew's home and observed Moore, who was crying, walking down the front steps toward the road wearing only a blanket. Moore

told the officers that Killebrew had strangled her and punched her in the face, and the officers observed dried blood on her face and arms, scratches on her right shoulder, bruises on her left arm, and marks on her neck. The officers then noted the protective order in place prohibiting Killebrew's contact with Moore. Moore was treated by paramedics at the scene for her injuries, and four days later she went to the hospital due to the injuries to her throat. Killebrew was transported to the hospital for treatment to the cut on his head, and at the hospital he became aggressive with officers after he had been advised that he would be arrested. When the officers attempted to restrain him, he fought with them and attempted to bite one of them.

[5] On August 26, 2013, the State charged Killebrew with Count I, strangulation as a class D felony; Count II, invasion of privacy as a class A misdemeanor; and Count III, domestic battery as a class A misdemeanor. On May 9, 2014, the court held a jury trial at which evidence consistent with the foregoing was presented. At the trial, Moore indicated that she had previously asked for the protective order and agreed that it was issued on August 2, 2012, and did not expire until August 2, 2014. The State presented Moore with a photograph depicting her wrapped in a blanket with some blood on her face and marked State's Exhibit 3, and she indicated that the photograph was taken on the night in question. When asked if she had an injury depicted in the photograph, Moore testified: "I know that's his blood." *Id.* at 36. When the State offered the photograph into evidence, Killebrew's counsel asked preliminary questions and objected due to lack of proper foundation. The court overruled the

objection and admitted the photograph. The State then handed Moore another photograph depicting marks on her neck and marked as State's Exhibit 4, and Moore indicated that she recognized the photograph, that the photograph was of her, and that it was taken on the night in question. She specifically indicated that the photograph "truly and accurately represent[ed her] on the night of these events." *Id.* at 39. When offered, Killebrew again objected due to lack of proper foundation, and the court admitted State's Exhibit 4 over his objection. On cross-examination, Moore testified that she "thought [the protective order] had been dropped" but found out following the incident that "it wasn't." *Id.* at 45. She testified that she "told him [she] thought it was dropped but it was a different one . . . ." *Id.* at 46.

[6] Officer Spicer testified that he recognized the photograph admitted as State's Exhibit 3, that he took the photograph, and that the photograph was "a true and accurate representation of the injuries [he] witnessed." *Id.* at 60. Officer Spicer similarly testified that he took the photograph admitted as State's Exhibit 4 and that the photograph depicted "[t]he redness around, surrounding her neck, her throat area," which he observed with his naked eye. *Id.* at 61.

[7] When asked about the protective order, Killebrew testified that he "never knew actually when the protective order was on me. I'd say after the first case, they told me that it was all dropped." *Id.* at 89. He testified that he "knew about a no contact order" but "never knew about a protection order." *Id.* at 90. He further testified that he believed the order was dropped "[b]ecause [he] completed the classes that [the court] had [him] do and just say [sic] at the end

of the classes, you're pretty much, everything gets dropped." *Id.* at 90-91. He testified that he also believed the order had been dropped because "the police have already brought her to my house" after Moore "got in some kind of altercation with her son-in-law or something . . . two, three months prior to this incident . . . ." *Id.* at 91. On cross-examination, Killebrew testified that due to a previous altercation, he was ordered to take a series of twenty-seven domestic violence classes over a period of six months, and when asked if it was "possible there was another protective order out there," he responded: "I guess it's possible because that's pretty much what's going on." *Id.* at 105. When asked if he was served the protective order while in jail on August 2, 2012, Killebrew stated: "I imagine so but I cannot recall. I guess because I, if I as [sic] incarcerated, I must have been so heated that I just signed the paper that they put in front of me." *Id.* at 106.

[8] On May 13, 2014, the jury found Killebrew guilty as charged. On June 11, 2014, the court sentenced him to three years executed in the Department of Correction on Count I, one year suspended on Count II, and one year suspended on Count III, and the court ordered that Counts II and III be served concurrently on supervised probation and consecutive to Count I.

## *Discussion*

### I.

[9] The first issue is whether the trial court abused its discretion in admitting certain photographs into evidence. The admission and exclusion of evidence

falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[10] As a general rule, photographs are admissible as demonstrative evidence if they illustrate a matter about which a witness has been permitted to testify. *Timberlake v. State*, 679 N.E.2d 1337, 1341 (Ind. Ct. App. 1997). The proponent of the evidence must first authenticate the photograph. *Id.* The sponsoring witness must establish that the photograph is a true and accurate representation of the things that it is intended to portray. *Id.* The photograph must also be relevant. *Id.* "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. A photograph is relevant if it depicts a scene that a witness would be permitted to describe verbally. *Timberlake*, 679 N.E.2d at 1341. Relevant evidence is generally admissible; evidence that is not relevant is not admissible. Ind. Evidence Rule 402. Also, "[t]he photographer need not be called to authenticate it, rather, anyone familiar with the material in the picture may testify as to its accuracy." *McPherson v. State*, 178 Ind. App. 539, 552, 383

N.E.2d 403, 412 (1978) (citing *Boone v. State*, 267 Ind. 493, 494-495, 371 N.E.2d 708, 709 (1978)).

[11] Killebrew argues that two photographs admitted into evidence as State's Exhibits 3 and 4 lacked a proper foundation. He asserts that Moore testified she could not remember what she had written in the domestic violence affidavit and that she did not take either photograph. He argues that she testified she had not seen State's Exhibit 3 depicting blood on her face until the trial and "never even testified that it accurately represented her blood on her face," instead testifying "that it was Killebrew's blood that dripped on her face . . . ." Appellant's Brief at 7. Regarding State's Exhibit 4, which depicts the marks on Moore's neck, Killebrew notes that the State asked Moore if the picture "accurately represents you on the night of these events" and that she replied "[y]eah." *Id.* at 8. In addition, he "asks this Court to do a very simple exercise. Lower your chin. Look down. And see if you can see your neck. And you are not drunk. Moore couldn't see her neck either." *Id.* He argues: "Why didn't the State wait until the Officer who took the photographs could authentic [sic] them?" *Id.* He also argues that the admission of the photographs was not harmless error because, without the photographs, the evidence was insufficient to convict him on Count I, strangulation as a class D felony.

[12] The State argues that the photographs were properly admitted as Moore testified that they "were photographs of her taken on the night in question." Appellee's Brief at 9. The State asserts that "Killebrew tacitly concedes that the officer who took the photographs later laid adequate foundation when he

testified that the photographs were a true and accurate depiction of the scene as he witnessed it." *Id.* at 9-10. The State contends that "Killebrew incorrectly attempts to apply a silent witness level of authentication to these photographs, which were admitted for demonstration purposes." *Id.* at 10. It further argues that, even if the court erred in admitting the photographs, the error was harmless because "an accurate foundation was laid for the photographs, at the very least, by the officer" and "the photographs were merely cumulative of the testimony of the witnesses." *Id.*

[13] Regarding State's Exhibit 4, the record reveals that when presented with the photograph Moore indicated that she recognized it, that it was of her, and that it was taken on the night in question. Moore specifically indicated that the photograph "truly and accurately represent[ed her] on the night of these events." Transcript at 39. To the extent Killebrew suggests that Moore could not authenticate State's Exhibit 4 because she could not view her neck injuries by looking down, we note that she recognized herself in the photograph and further testified that she sought medical attention for her neck injuries. Accordingly, we conclude that the court did not abuse its discretion in admitting State's Exhibit 4.

[14] Second, when presented with State's Exhibit 3, which depicted Moore wrapped in a blanket with some blood on her face and marked State's Exhibit 3, she indicated that the photograph was taken on the night in question. When asked if she had an injury depicted in the photograph, Moore testified: "I know that's his blood." *Id.* at 36. To the extent that Killebrew argues that the photograph

did not accurately depict her blood on her face, we note that Moore testified that the blood was Killebrew's. Thus, Moore placed the photograph in context and explained what it depicted, which was that she was found wearing only a blanket and with Killebrew's blood on her face. We cannot say that the court abused its discretion in admitting State's Exhibit 3.

[15] Even if it was an abuse of discretion for the court to admit State's Exhibit 3 because Moore did not testify that it was a true and accurate representation of what it was intended to portray, we find such error to be harmless. An error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Gault v. State*, 878 N.E.2d 1260, 1267-1268 (Ind. 2008). The record reveals that, following Moore's testimony, the State called Officer Spicer who testified that he recognized the photograph admitted as State's Exhibit 3, that he took the photograph, and that the photograph was "a true and accurate representation of the injuries [he] witnessed." Transcript at 60.

[16] Moreover, we find that the photographs admitted as State's Exhibits 3 and 4 were cumulative of other evidence properly admitted. *See Helsley v. State*, 809 N.E.2d 292, 296 (Ind. 2004) (holding that admission of cumulative evidence alone is insufficient to warrant a new trial (citing *Kubsch v. State*, 784 N.E.2d 905, 923 (Ind. 2003))). Moore testified that when she encountered police she was wearing only a blanket, and she explained that when she struck Killebrew with a glass she caused him to bleed. Officer Spicer gave similar testimony regarding the condition of Moore when he found her. He also testified

regarding his observations of "redness around, surrounding her neck, her throat area," which he observed with his naked eye. Transcript at 61. Reversal on this basis is not warranted.

## II.

[17] The next issue is whether the evidence is sufficient to sustain Killebrew's conviction for invasion of privacy. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[18] Ind. Code § 35-46-1-15.1 governs the crime of invasion of privacy and provided in relevant part at the time of the offense as follows: "A person who knowingly or intentionally violates: . . . (2) an ex parte protective order issued under IC 34-26-5 . . . commits invasion of privacy, a Class A misdemeanor. . . ." Ind. Code § 35-46-1-15.1 (West 2010) (subsequently amended by Pub. L. No. 158-2013, § 557 (eff. July 1, 2014)). The State alleged, under Count II, that "on or about August 24, 2013 at or near 931 E. Richmond in Howard County, State of Indiana, Myron Dale Killebrew, did knowingly or intentionally violate an ex parte protective order issued under I.C. 34-26-5 . . . to protect Ena Moore . . . ." Appellant's Appendix at 15.

Killebrew argues that "[a]ll of the evidence in this case is that [he] did not 'knowingly or intentionally' violate anything." Appellant's Brief at 5. He maintains that "Moore believed that she didn't have a protective order and that the protective order she has obtained was no longer in effect," and that she told Killebrew that the order was no longer in effect. *Id.* (internal citation omitted). Killebrew asserts that he "believed the protective order had been vacated by his complying with the Court's order to successfully complete classes." *Id.* He also argues that "the State showed him there was no protective order when the police brought an intoxicated Moore to him just months before." *Id.* He further asserts without citation to authority that "at a minimum, the State should be estopped from acting that there is no protective order in April, 2013, and charging a violation of one mere months later." *Id.* at 6.

The State argues that "Killebrew admitted that a protective order was in place against him, and that he was served with the order the day it was issued." Appellee's Brief at 7. It asserts that there was "no dispute that Moore was inside Killebrew's house, and that his contact with her was a violation of the protective order." *Id.* The State contends that Killebrew's argument is a request to "reweigh the evidence and credit his self-serving statements that he was unaware of the order . . . ." *Id.* at 8.

The record reveals that on August 2, 2012, Moore received an *ex parte* protective order against Killebrew stating in part that Killebrew "is prohibited from harassing, annoying, telephoning, contacting or directly or indirectly communicating with" Moore. State's Exhibit 1. The exhibit of the protective

order admitted into evidence indicates that it was served on Killebrew that same day. Although Killebrew initially testified that he believed the protective order had been dropped, during cross-examination he admitted that it was "possible" that the order was separate from a no contact order he had received previously for which he had attended domestic violence classes. Transcript at 105. He was also asked about whether he had been served the protective order on August 2, 2012, and he testified: "I imagine so but I cannot recall. I guess because I, if I as [sic] incarcerated, I must have been so heated that I just signed the paper that they put in front of me." *Id.* at 106. Moore testified that she "told him [she] thought it was dropped but it was a different one . . . ." *Id.* at 46. On August 24, 2013, while the protective order was in effect, Moore knocked on Killebrew's door and Killebrew let Moore inside.

[22] We conclude that the State presented evidence of probative value from which a reasonable jury could have found that Killebrew knowingly violated the protective order, and his arguments amount to an invitation to reweigh the evidence or judge the credibility of witnesses, which we cannot do. *See Jordan*, 656 N.E.2d at 817. In so concluding, we observe, regarding the potential impact of Moore's decision to visit Killebrew's home, that the "lack of consent is not an element of invasion of privacy, and there is no element of that offense that [the victim's] consent would negate." *Dixon v. State*, 869 N.E.2d 516, 520 (Ind. Ct. App. 2007). This court in *Dixon* observed specifically that "[w]hen determining whether a party committed the act of invasion of privacy . . . we do not consider whether the victim knowingly ignored the protective order but,

rather, whether the defendant knowingly violated the protective order," and that a protective order is between the defendant and the State, not the defendant and the victim. *Id.* (citing Ind. Code § 34-26-5-11 ("If a respondent is excluded from the residence of a petitioner or ordered to stay away from a petitioner, an invitation by the petitioner to do so does not waive or nullify an order for protection.")). It was incumbent upon Killebrew, not Moore, to see that a violation of the protective order did not occur. *See also Patterson v. State*, 979 N.E.2d 1066, 1069 (Ind. Ct. App. 2012) (noting that "our General Assembly has determined that where a protected person invites the subject of a protective order to violate the terms of the order, such is irrelevant to the subject's guilt," that "Protection orders are about the behavior of the respondent and nothing else," and that "[h]ow or why a respondent finds himself at the petitioner's doorstep is irrelevant") (quoting *State v. Lucas*, 795 N.E.2d 642, 648 (Ohio 2003)).

## Conclusion

For the foregoing reasons, we affirm Killebrew's convictions and sentences for strangulation as a class D felony, invasion of privacy as a class A misdemeanor, and domestic battery as a class A misdemeanor.

Affirmed.

Bailey, J., and Robb, J., concur.